This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

### IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-35224**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

**v.**

**ZACHARY KRIESEL,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
**Louis P. McDonald, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Walter Hart, Assistant Attorney General
Albuquerque, NM

for Appellee

The Law Office of Scott M. Davidson, Ph. D., Esq.
Scott M. Davidson
Albuquerque, NM

for Appellant

### MEMORANDUM OPINION

**BOGARDUS, Judge.**

**{1}** Defendant Zachary Kriesel appeals his conviction for child abuse resulting in great bodily harm. Defendant challenges (1) the child abuse jury instruction used at trial; (2) the sufficiency of the evidence supporting the conviction; (3) the admission of medical testimony he characterizes as irrelevant; and (4) the trial, generally, as leading to a wrongful conviction because of cumulative error. Concluding that there was no error as Defendant contends, we affirm.

## BACKGROUND

**{2}** The following facts are taken from testimony at the second trial[1] of this matter. At the time of the incidents leading to Defendant's arrest, he was living in an apartment with his fiancée, Ashley, and her two children, Andree, about nineteen months old, and Areana, four years old. Areana was small for her age—not much bigger than Andree, according to Ashley. The four started living together in March 2011, about three months after Defendant and Ashley began their relationship.

**{3}** On the weekend of July 30 and 31, 2011, Andree was staying with Ashley's mother. During that time, Andree came down with a cold accompanied by a fever. Ashley started a new job that Monday, August 1. Defendant watched the children while she was away; it was the first time he was alone with them for a full day. When Ashley came home from work that afternoon, she decided to take Andree to the emergency room because of his fever. There, a doctor examined Andree, including taking his temperature, checking his vital signs, and checking his belly. Ashley was present during the examination and testified that there was nothing unusual about Andree's body or skin; specifically, she testified that he had no bruises. The doctor determined that Andree needed Motrin and a popsicle. Ashley then took Andree home, where he slept and, according to Ashley, was "fine."

**{4}** On Tuesday, August 2, Ashley went to work and again left the kids in Defendant's care. After work, instead of going directly home, Ashley went shopping with her grandmother and sister. Once home, Ashley checked on Andree, who was asleep in his crib. He was dressed in footed pajamas, fully zipped; Ashley considered his dress unusual, especially given the time of year. That night, at about 2:00 or 3:00 a.m., Andree was "groaning, like he was in pain[,]" according to Ashley. Ashley checked on him, thinking perhaps his fever had worsened. She adjusted his pacifier, and he went back to sleep.

**{5}** Defendant described what happened that Tuesday while he was caring for the children. Andree started choking while eating macaroni and cheese with hot dogs. Defendant patted him on the back and did compressions on his stomach and managed to dislodge the food. Later, while the kids were playing Ring Around the Rosie on the balcony, Andree fell and hit his head. Afterward, Andree was "playing around throughout the house" and "seemed fine."

**{6}** Ashley went to work on Wednesday, August 3. At one point, she phoned Defendant, who told her that Areana had hit Andree with an Etch-A-Sketch-type toy. When Ashley came home after work, Andree was slumped over on the couch, in blankets, surrounded by stuffed animals, struggling to breathe, not moving, and "throwing up green stuff everywhere." Though Defendant believed it was unnecessary, Ashley sought medical help. She and her sister drove to a pediatric care center while Defendant stayed home with Areana. In the car on the way there, Ashley changed Andree's diaper and noticed bruises all over Andree's body. The doctors at the center

---

1The first trial, held in August 2013, ended in a mistrial when the jury was unable to reach a unanimous verdict.

examined Andree and then sent them to the hospital in an ambulance. From the hospital, Ashley relayed to Defendant that Andree had forty-five bruises all over his body, "all brand new." Andree underwent emergency surgery for internal injuries.

**{7}** Defendant described the events of that Wednesday as follows. He fed the kids breakfast, laid them down for a nap, and gave them a bath. In the afternoon, he put them in a room, with the door open, to watch a movie while he played a video game in the living room. The kids "were getting along perfectly fine." At some point, Defendant heard Andree make a "death cry" while Areana yelled. Defendant got up and saw Areana striking Andree with the Etch-A-Sketch. He never noticed that Andree was in pain or was suffering, but when Ashley arrived home he did notice that Andree's breathing had changed.

**{8}** Andree underwent follow-up surgeries and stayed in the hospital for the rest of August. After the incident, Defendant moved out of the apartment and Ashley cut off contact with him.

**{9}** Several medical experts testified about the nature of Andree's injuries. A neuroradiologist who reviewed radiological images of Andree's head taken on August 3, 2011 testified that Andree had a subdural hematoma, or bleeding outside the brain, caused by "significant trauma[,]" such as that which could be caused by a high speed automobile accident or intentional abuse, and greater than that which could be caused by a fall from a short height. He also testified that the injury was "probably within a few days" old. Another expert testified that she did not believe it possible that a four-and-a-half year old could have caused Andree's subdural hematoma.

**{10}** The doctor who performed emergency surgery on Andree removed a portion of Andree's intestine. He testified that the injury, caused by trauma, probably happened within the previous twenty-four hours and that Andree "would[ not] have survived days" without the surgery.

**{11}** Ashley testified that she did not, nor would she ever, hurt Andree. She also testified that before the incident, Andree had no injuries requiring medical attention, and that after the incident, he had only one: he tripped on a stool at daycare and got stitches on his eyebrow. She further testified that Areana did not cause his injuries.

**{12}** Ashley's mother testified that Andree never left her care while he was with her the previous weekend and that he was "fine" when he left on that Sunday. She further testified that she saw Andree's bruises at the hospital on that Wednesday, that the bruises were not there when she bathed him over the weekend, and that she would have noticed had they been. The jury convicted Defendant of child abuse resulting in great bodily harm. Defendant now appeals.

**DISCUSSION**

**I.      Jury Instructions**

**{13}**  Defendant first challenges the propriety of one of the instructions given to the jury. We are guided by the following principles in our review of this issue.

> The standard of review we apply to jury instructions depends on whether the issue has been preserved. If the error has been preserved we review the instructions for reversible error. If not, we review for fundamental error. Under both standards we seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction. A juror may suffer from confusion or misdirection despite the fact that the juror considers the instruction straightforward and perfectly comprehensible on its face. Thus, juror confusion or misdirection may stem not only from instructions that are facially contradictory or ambiguous, but from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law.

*State v. Benally,* 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (internal quotation marks and citations omitted).

**{14}**  Defendant states that he preserved this argument, but—contrary to our rules of appellate procedure—does not cite the transcript of proceedings to confirm his assertion. *See* Rule 12-318(A)(4) NMRA. Defendant's only reference in his brief in chief to a relevant objection consists of a quote of an alternative jury instruction Defendant requested; however, that request was made at Defendant's first trial, not, as would make the objection timely, the second, from which his conviction arose. *See State v. Montoya,* 2015-NMSC-010, ¶ 45, 345 P.3d 1056 ("[T]o preserve an issue for appeal, a defendant must make a timely objection."). The State, meanwhile, is silent on whether this issue was preserved. We need not resolve this matter because, for the reasons outlined below, we ultimately see no error in the instruction.

**{15}**  Defendant's arguments on this issue essentially follow two lines of reasoning. First, he argues, the jury instruction given would have confused or misdirected a reasonable juror because of its internal contradiction and ambiguity. The instruction directed the jury to find Defendant guilty of child abuse if it found two elements that Defendant contends conflict with one another. Those elements are found in Paragraphs 1 and 3 of the instruction, which reads in full as follows.

> For you to find [Defendant] guilty of child abuse resulting in death or great bodily harm, the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. [Defendant] struck or caused Andree . . . to be struck in the head and abdomen;
>
> 2. By engaging in the conduct described in Paragraph 1, [Defendant] caused Andree . . . to be tortured or cruelly punished;

3. [Defendant] showed a reckless disregard for the safety or health of Andree[.] To find [Defendant] showed a reckless disregard, you must find that [Defendant's] conduct was more than merely negligent or careless. Rather, you must find that [Defendant] caused a substantial and unjustifiable risk of serious harm to the safety or health of Andree[.] A substantial and unjustifiable risk is one that any law-abiding person would recognize under similar circumstances and that would cause any law-abiding person to behave differently than [Defendant] out of concern for the safety or health of Andree[;]

4. [Defendant's] conduct resulted in great bodily harm to Andree [;]

5. Andree . . . was under the age of eighteen (18);

6. This happened in New Mexico on or about August 3, 2011.

Defendant asserts that the instruction "contained both intentional and reckless theories of mens rea"; that is, he continues, "[t]he instruction presented in part an intentional theory (Element 1) and partly a theory of reckless disregard (Element 3)." On the basis of the alleged dual theories, he concludes that his conviction cannot stand.

**{16}** We agree with Defendant that the instruction's third element embodied the theory that Defendant committed child abuse by acting with reckless disregard; this is apparent in the third paragraph's wording. We disagree, however, that the first element embodied a theory that Defendant intended the child abuse. For one thing, the word "intentionally" is absent from the first paragraph and, for that matter, the remainder of the instruction. For another, to the extent that the paragraph connotes intentionality, such intentionality relates to the active, voluntary nature of Defendant's conduct. Committing an act actively and voluntarily is compatible with a theory of child abuse resulting from one's reckless disregard for the consequences of the act. We therefore disagree that the jury instruction would have confused or misled a reasonable juror due to facial contradiction or ambiguity, because we see no such contradiction or ambiguity.

**{17}** We likewise reject Defendant's second line of argument, which centers on his contention that the instruction misaligned with the State's theory of the case. Specifically, Defendant argues that "[w]here the State has presented an intentional theory at trial, it cannot then present the jury with an instruction based on a mens rea of reckless disregard." Presumably Defendant refers to the State's presentation of its theory to the jury.

**{18}** Even assuming Defendant's proposition is an accurate reflection of the law, his support for the argument fails. His evidence that the State presented an intentional theory consists primarily of this statement by the prosecutor: "[T]here is no negligent jury instruction here, we're going strictly on intentional." But this statement was made during argument on Defendant's directed verdict motion, not to the jury.

**{19}** As additional evidence of his assertion that the State presented only an intentional theory of child abuse, Defendant cites to remarks from the State's opening

statement, namely this: "We will show that . . . Defendant acted intentionally or with reckless disregard." Yet even if we adopt Defendant's view that the State presented an intentional theory only—and ignore the "or with reckless disregard" portion of the prosecutor's statement—we recognize no error in the jury instruction's use.

**{20}**   The instruction given was based on the Uniform Jury Instruction for child abuse resulting in great bodily harm, UJI 14-615 NMRA. UJI 14-615 took effect on April 3, 2015, shortly before Defendant's trial. UJI 14-615 was authoritative then and now. Committee commentary on a related UJI, UJI 14-612 NMRA, to which committee commentary for UJI 16-415 refers, makes clear that the "reckless disregard" language, as used in Paragraph 3 of the jury instruction at issue here, is proper even in cases where the State's theory is based on intentional child abuse. Specifically, the commentary reads: "Separate instructions for intentional child abuse . . . are not provided because evidence that the defendant's conduct was . . . intentional will meet the reckless disregard standard." The statement is buttressed by citations to *State v. Montoya*, 2015-NMSC-010, ¶ 33, 345 P.3d 1056, and the Model Penal Code § 2.02(5). Notably, none of the committee commentary-based exceptions to the sole use of UJI 14-615 apply here.

**{21}**   Thus, the use of the jury instruction here was proper even if the State advanced an intentional theory of child abuse. It was proper if the State advanced a reckless disregard theory of child abuse. Insofar as the use of the jury instruction is concerned, it is immaterial whether the State's theory was one of intentional or reckless child abuse. Therefore, we conclude there was no error in the instruction's use.

## II.   The Evidence Is Sufficient to Support Defendant's Child Abuse Conviction

**{22}**   Defendant next argues that his conviction was not supported by sufficient evidence. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *Montoya*, 2015-NMSC-010, ¶ 52 (internal quotation marks and citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *State v. Salgado*, 1999-NMSC-008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted). Lastly, on appeal, we "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences . . . in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.

**{23}**   Defendant essentially argues that there are three flaws with the evidence presented at trial: (1) the evidence did not directly link Andree's injuries to acts by Defendant; (2) "one of the State's key witnesses[,]" Areana, "had significant gaps in her testimony"; and (3) the jury had to "pil[e] inference upon inference" to reach its verdict.

**{24}**   Concerning Defendant's first contention, we recognize that no direct evidence was presented to establish that Defendant caused Andree's injuries. But direct evidence

was not required. *See, e.g.*, *Montoya*, 2015-NMSC-010, ¶ 52 (recognizing that evidence of a circumstantial nature may suffice to support a guilty verdict).

**{25}** Turning to Defendant's second argument regarding gaps in Areana's testimony, we note that Areana was eight at the time she testified and—presumably because of the passage of time since the incident and her young age when it occurred—could not remember all details regarding the events about which she testified. Yet despite the gaps in her testimony, she furnished key pieces of evidence by stating that, the day Andree went to the hospital, and while her mother was at work, Andree "got hit by someone" other than her and also that she never hit Andree with the Etch-A-Sketch. Areana's testimony supported a finding of guilt.

**{26}** Finally, with regard to Defendant's third contention, Areana's testimony narrowed the inferences required for the jury to conclude that Defendant committed child abuse. Defendant himself drew the decisive inference when he testified about his and Ashley's text message exchange about Andree's forty-five bruises. He elaborated on one of his text messages by saying that, "[I]t was only Areana and I that were in the apartment. It was us two that were there. So if [Ashley has] already [shifted fault from] Areana . . . I automatically figured that she was blaming me. It's only human."

**{27}** The jury was presented with evidence that Areana did not cause his injuries. It was also presented with evidence that the injuries occurred within the seventy-two hours before the evening of August 3. It is reasonable for the jury to infer, as Defendant did, that if Areana did not cause the injuries, and only she and Defendant were in the apartment with Andree, then it was Defendant who caused them. We conclude, therefore, that sufficient evidence supports the jury's finding of guilt.

### III. We Do Not Review Defendant's Claim Related to the Admission of Evidence of Injuries

**{28}** Defendant argues that certain medical testimony "added nothing of value to the trial, confused the jury, and prejudiced [Defendant]." Defendant fails in his briefs to cite the specific medical testimony which he finds objectionable, fails to cite the portion of the trial transcript where his objection to the admission of this testimony was preserved, fails to cite to applicable New Mexico decisions and—in devoting a scant page and a half in his brief in chief to the matter—fails to adequately develop his argument. We therefore decline to review this issue. *See* Rule 12-318(A)(4); *State v. Dombos*, 2008-NMCA-035, ¶ 42, 143 N.M. 668, 180 P.3d 675 ("[N]o error is shown when a party fails to provide references to the transcript or the record where the issue was raised below[.]"); *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be.").

### IV. Defendant's Conviction Did Not Result From Cumulative Error

**{29}**  Having recognized no error as asserted by Defendant, we need not analyze whether his conviction was the result of cumulative error. *See State v. Aragon*, 1999-NMCA-060, ¶ 19, 127 N.M. 393, 981 P.2d 1211.

**CONCLUSION**

**{30}**  We affirm.

**{31}  IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**BRIANA H. ZAMORA, Judge**